# IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF ALABAMA
### SOUTHERN DIVISION

| | | |
|---|---|---|
| BRAD SIMS, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | Case No. 2:15-cv-00421-TMP |
| | ) | |
| ALABAMA DEPARTMENT OF | ) | |
| HUMAN RESOURCES, *et al.*, | ) | |
| | ) | |
| Defendants. | ) | |

## <u>MEMORANDUM OPINION</u>

This cause is before the court on the Motion for Summary Judgment filed by defendants Alabama Department of Human Resources ("ADHR") and Blount County Department of Human Resources ("Blount County DHR") (together "Defendants"). (Doc. 47). The matter has been fully briefed, and oral argument was heard on the motion on May 22, 2017. The parties have consented to the exercise of dispositive jurisdiction by the undersigned magistrate judge pursuant to 28 U.S.C. § 636(c). (Doc. 25). Accordingly, the court issues the following memorandum opinion and order.

# I.     SUMMARY JUDGMENT STANDARD

Under Federal Rule of Civil Procedure 56(a), summary judgment is proper "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a).  The party asking for summary judgment "always bears the initial responsibility of informing the district court of the basis for its motion, and identifying those portions of 'the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any' which it believes demonstrate the absence of a genuine issue of material fact." Celotex Corp. v. Catrett, 47 U.S. 317, 323 (1986) (quoting former Fed. R. Civ. P. 56(c)).  The movant can meet this burden by presenting evidence showing there is no dispute of material fact or by showing that the nonmoving party has failed to present evidence in support of some element of its case on which it bears the ultimate burden of proof. Celotex, 477 U.S. at 322-23.  There is no requirement, however, "that the moving party support its motion with affidavits or other similar materials *negating* the opponent's claim." Id. at 323.

Once the moving party has met its burden, Rule 56 "requires the nonmoving party to go beyond the pleadings and by her own affidavits, or by the 'depositions, answers to interrogatories, and admissions of file,' designate 'specific facts showing that there is a genuine issue for trial.'" Id. at 324 (quoting former Fed. R.

Civ. P. 56(e)).  The nonmoving party need not present evidence in a form necessary for admission at trial; however, he may not merely rest on his pleadings. Celotex, 477 U.S. at 324.  "[T]he plain language of Rule 56(c) mandates the entry of summary judgment, after adequate time for discovery and upon motion, against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial."  Id. at 322.

After the plaintiff has properly responded to a proper motion for summary judgment, the court "shall" grant the motion if there is no genuine issue of material fact, and the moving party is entitled to judgment as a matter of law.  Fed. R. Civ. P. 56(a).  The substantive law will identify which facts are material and which are irrelevant.  Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986).  A dispute is genuine "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party."  Id. at 248.  "[T]he judge's function is not himself to weigh the evidence and determine the truth of the matter but to determine whether there is a genuine issue for trial."  Id. at 249.  His guide is the same standard necessary to direct a verdict:  "whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law."  Id. at 251-52; see also Bill Johnson's Restaurants, Inc. v. N.L.R.B., 461 U.S. 731, 745 n. 11 (1983).

However, the nonmoving party "must do more than simply show that there is some metaphysical doubt as to the material facts." Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp., 475 U.S. 574, 586 (1986). The evidence supporting a claim must be "substantial," Marcus v. St. Paul Fire and Marine Ins. Co., 651 F.2d 379 (5th Cir., Unit B, 1981); a mere scintilla of evidence is not enough to create a genuine issue of fact. Young v. City of Palm Bay, 358 F.3d 859, 860 (11th Cir. 2004); Kesinger ex rel. Estate of Kesinger v. Herrington, 381 F.3d 1243, 1249-50 (11th Cir. 2004). If the evidence is merely colorable, or is not significantly probative, summary judgment may be granted. Anderson, 477 U.S. at 249 (citations omitted); accord Spence v. Zimmerman, 873 F.2d 256 (11th Cir. 1989). Furthermore, the court must "view the evidence presented through the prism of the substantive evidentiary burden," so there must be sufficient evidence on which the jury could reasonably find for the plaintiff. Anderson, 477 U.S. at 254; Cottle v. Storer Communications, Inc., 849 F.2d 570, 575 (11th Cir. 1988). Nevertheless, credibility determinations, the weighing of evidence, and the drawing of inferences from the facts are the function of the jury, and therefore the evidence of the non-movant is to be believed and all justifiable inferences are to be drawn in his favor. Anderson, 477 U.S. at 255. The non-movant need not be given the benefit of every inference but only of every reasonable inference. Brown v. City of Clewiston, 848 F.2d 1534, 1540 n. 12 (11th Cir. 1988).

## II. FACTS

Viewing the facts in the light most favorable to the non-moving plaintiff, the following facts are relevant to the instant Motion for Summary Judgment.

Brad Sims (the "plaintiff") began working with Blount County DHR as a Social Services Caseworker in the Child Protective Services Division on April 1, 1996. As a Caseworker, the plaintiff performed field work, including home visits to evaluate the home-life situations of at-risk children. In April of 2008, the plaintiff began suffering from myopathy and neuropathy, the wasting of muscle and nerves, respectively. He submitted a Disability Accommodation Request to his supervisor stating that he was suffering from an "undiagnosed degenerative muscle problem" and detailing his restricted mobility and difficulty with walking and climbing steps.[1] He stated that it was becoming more difficult to enter residences that had steps without handrails or "higher unstable steps." (Doc. 53-2, p. 3). He also noted that he was concerned for his safety should he need to leave an area quickly, as his disorder made it more difficult to do so. (Id.)

Sims testified that, following his request for accommodation, he discussed the request with his direct supervisor, Cheryl Helton, and the Director of Blount County DHR, Marcia Parker. According to the plaintiff, he was offered the choice

---

[1] The request in question has two dates. The first, April 7, 2008, is located next to the plaintiff's signature. The second date, April 10, 2008, is located next to the signature of Marcia Parker. (Doc. 53-2, p. 2). The precise date on which this request was received, however, has no bearing on the outcome of this action.

between disability retirement and a transfer to the child support division. (Sims Depo., Doc. 53-16, pp. 22-25). The plaintiff declined the offer of transfer and did not retire. (Id. at 25). On May 7, 2008, the Director of Civil Rights/Equal Employment for ADHR, Desiree Jackson, sent the plaintiff a letter informing him that specific information was needed regarding his disability from his treating physician. On July 23, 2008, the plaintiff wrote a letter to Blount County Director Marcia Parker and Program Supervisor Cheryl Helton, stating that his doctor was still attempting to diagnose his illness, but that his doctor agreed that he should not go up steps when entering homes and that his condition essentially prevents him from conducting home visits. (Doc. 53-3, p. 2). The plaintiff asked that he be relieved of home-visit duties. (Id.) On October 2, 2008, the plaintiff e-mailed Helton to inform her that he had fallen while walking down the steps of a porch during a home visit. (Doc. 53-4). Ultimately, the plaintiff was diagnosed with Charcot-Marie-Tooth Syndrome, which is a hereditary disorder that causes nerve damage to the legs and results in smaller and weaker muscles.[2]

On the same day, October 2, 2008, the plaintiff filed a Charge of Discrimination with the Equal Employment Opportunity Commission against

---

[2] The Mayo Clinic lists the signs and symptoms of Charcot-Marie-Tooth as including: weakness in your legs, ankles and feet; loss of muscle bulk in legs and feet; high foot arches; curled toes (hammertoes); decreased ability to run; difficulty lifting the foot at the ankle (footdrop); awkward or higher than normal step (gait); frequent tripping or falling; and decreased sensation or a loss of feeling in the legs and feet. See https://www.mayoclinic.org/diseases-conditions/charcot-marie-tooth-disease/symptoms-causes/syc-20350517 (Viewed October 13, 2017).

Blount County DHR, alleging violations of the Americans with Disabilities Act ("ADA"). He asserted then that he had been placed on restrictions by his doctor, including no climbing of stairs. According to the plaintiff, his supervisors continued to assign him cases requiring stair climbing and "harassed" him about the process of diagnosing his illness. He wrote that his doctor informed him of his diagnosis on September 16, 2008. He claims that Parker and Helton "offered me a demotion and disability retirement," and told him that no accommodations could be made for him. (Doc. 53-5). The plaintiff alleges that no attempts were made to accommodate his disability.

Following the 2008 charge of discrimination, the plaintiff and Blount County DHR reached an agreement and entered into a Mediation Settlement Agreement regarding Charge No. 420-2008-03662 (the "Agreement") on June 29, 2009. (Doc. 53-9). In the Agreement, the plaintiff agreed to submit an official request for accommodation along with a physician's diagnosis, and Blount County DHR agreed to transfer the plaintiff to an Intake Worker position at the Blount County office. (Id.) On June 18, 2009, the plaintiff submitted the Reasonable Accommodation Request contemplated in the Agreement, requesting a job transfer. The request was accompanied by a letter from Dr. Marla Black Morgan, which stated:

> Mr. Brad Sims was seen for evaluation in the Neurology Clinic at the Kirklin Clinic in Birmingham, Alabama. As a result of his evaluation, he was found to have evidence of widespread active and chronic denervation consistent with a neuropathy by electrophysiological testing. His symptoms historically have been progressive. Due to his condition, he has weakness and is limited in his ability to lift items and ambulate. He was advised to limit his walking and take frequent breaks. He is not to climb stairs, reach overhead or carry items over five pounds in weight.

(Doc. 53-7, p. 3). Parker recommended approval of the request, which would accommodate the plaintiff by allowing him to work primarily in the DHR office. Following the plaintiff's transfer to the position of "Intake Worker," however, DHR continued to require the plaintiff to perform "on-call" home visits.[3] He continued to perform the on-call home visits without complaint, as he only did so infrequently and only was "on-call" four to five weeks a year. (Sims Depo., doc. 53-16, pp. 80-81).

The plaintiff's disease continued to worsen and, on July 11, 2013, he submitted another Reasonable Accommodation Request to Blount County DHR, requesting to be taken off all field-work duties requiring him to make home visits that required walking. (Doc. 53-8, p. 2). The plaintiff further stated that, although he had been transferred to Intake, he still was being required to do "on-call" duty,

---

[3] On-call home visits occurred when Child Protective Services social workers were called to respond to after-hour requests for assistance with children, such as when police needed social workers to take care of children after parents were arrested or removed from the home. Such calls required social workers to go to homes and other places where children needed supervision on an emergency basis.

which involved field-work. (Doc. 53-8, p. 3). The plaintiff said that the failure to remove him from "on-call" lists was an "oversight" that did not abide by the spirit of the Mediation Agreement, and that, due to his worsening condition, he no longer was able to perform "on-call" duties, even though he was "on-call" infrequently. (Id.) The request also included statements from Dr. Zakir Kahn, a copy of the 2009 letter from Dr. Morgan, Dr. Morgan's notes, and a copy of both the Agreement and the plaintiff's request for accommodation from June 2009. (Doc. 53-8). Maria Dresser, Director of Blount County DHR at the time, discussed with the plaintiff his request when he brought the completed request form to her. (Dresser Depo., doc. 53-17, p. 38). She also conducted independent research about the symptoms of Charcot-Marie-Tooth syndrome. (Id. at 54).

Ultimately, Dresser marked "recommended approval" on the request for reasonable accommodation. (Id. at 56). Dresser submitted her recommendation of approval to Desiree Jackson, the statewide Coordinator of the DHR Equal Employment Office, who, in turn, provided her recommendation to the DHR Commissioner, Nancy Buckner, that it be approved. The DHR Commissioner is the final decision-maker. Following Dresser's recommendation of approval, Jackson contacted the legal department to prepare an agreement to memorialize the accommodation. A Modified Settlement Agreement (the "Modified Agreement") was created, and Dresser e-mailed a copy of the agreement to the plaintiff for his

review on August 26, 2013.  (Doc. 53-9, pp. 3-5).  The Modified Agreement states that "Brad D. Sims is not required to perform on-call duties at BCDHR."  (Doc. 53-9, p. 4).  The plaintiff replied, and, after making some modifications, Dresser replied to the plaintiff via e-mail that she would return the amended agreement to him when she received it.  (Doc. 53-9, p. 2).  Dresser made the modifications discussed and returned the agreement to the legal department for approval.  After making the modifications, but prior to receiving a final document from the legal department or signing any agreement, Dresser was transferred to Calhoun County DHR.  Prior to her departure and because she had not yet received the modified amended agreement, Dresser offered the plaintiff a transfer to the Food Assistance department at the same rate of pay.  The plaintiff refused the transfer, as he believed that his request for accommodation was approved and all that was left to do was to sign the Modified Agreement and taking the transfer would cause him to lose seventeen years of seniority.  (Sims Depo., doc. 53-16, pp. 131-133).

Dresser was replaced as Director of Blount County DHR by Catherine Denard.  When Denard began working as Director, Cheryl Helton, Sims' supervisor, disclosed to Denard that Sims had filed a charge of discrimination with the EEOC against Blount County DHR in 2008 and that the EEOC charge was located in a "sealed" file marked "confidential."  (Denard Depo., doc. 53-18, pp. 108-109).  Helton informed Denard that the plaintiff had received his Intake

position following the 2008 EEOC charge and that Helton "didn't like" that the plaintiff had filed an EEOC charge against Blount County DHR. (Id. at pp. 114-116). On September 21, 2013, Denard wrote a letter to Desiree Jackson at ADHR, stating that she did not recommend the approval of the plaintiff's request to be taken off of "on-call" duty. (Doc. 53-10). Denard noted in her letter that on September 13, 2013, Dresser had offered the plaintiff a lateral transfer to the Food Assistance Program which would not have resulted in a pay decrease and would not have required field work and that the plaintiff refused the transfer. (Doc. 53-10, p. 3).

The plaintiff received a letter, dated October 15, 2013, from K.C. Hendrix, Civil Rights Analyst for ADHR Office of Civil Rights/Equal Employment. (Doc. 53-12). The letter was signed and approved by Desiree Jackson, Director of ADHR Office of Civil Rights/Equal Employment. In the letter, Hendrix informed the plaintiff that his request for accommodation was denied because he had not established himself as a person with a disability and, assuming he did have a disability, home visits are essential job functions[4] that he must be able to perform with a reasonable accommodation to be considered a "qualified" person under the ADA. The plaintiff received a letter from Catherine Denard, Interim Director of

---

[4] The plaintiff disputes that home visits and on-call duty are essential job functions for the Intake job he was performing at the time of the letter. The court makes no determination regarding what the essential functions of the plaintiff's jobs were but, instead, sets out the reasoning as explained in the decision-letter to the plaintiff.

Blount County DHR, dated November 26, 2013, stating that, in light of the denial of the plaintiff's request for accommodation, he had the option to take a voluntary demotion to a Financial Support Worker position at Blount County DHR, with a reduction in pay. Further, the plaintiff was given until December 6, 2013, to request the demotion, after which time an Administrative Hearing would be scheduled "to determine [the plaintiff's] continued employment with the agency." (Doc. 53-13, p. 2). Alternatively, the plaintiff was told that he could resign. (Id.) On December 6, 2013, the plaintiff accepted the offered demotion, stating that he would be "filing for Disability Retirement from the Agency, effective February 1, 2014." (Doc. 53-15). He stated in his letter that, based on Dennard's November 26 letter to him, he "had no choice" but to accept the demotion, but that he did so "reluctantly." (Id.)

On January 17, 2014, the plaintiff wrote a letter to Denard stating that he had applied and been approved for retirement from Blount County DHR on February 1, 2014. On February 18, 2014, the plaintiff filed a Charge of Discrimination against Blount County DHR with the EEOC, alleging violations of the ADA and the Rehabilitation Act of 1973.

The plaintiff's performance appraisals from 2008 were included in the plaintiff's evidentiary materials. In his Employee Performance Appraisal for August 1, 2008, to August 1, 2009, the plaintiff was rated as "exceeds standards,"

with a performance score of 34.33. The plaintiff was evaluated as a Social Service Caseworker. He was rated as "exceeds standards" again in his Employee Performance Appraisal from August 1, 2009, to August 1, 2010, with a performance score of 29. On August 17, 2010, the plaintiff received a Reprimand from Marcia Parker for campaigning on a social networking site during work hours and disclosing confidential DHR information. The plaintiff disputes that these actions occurred. The plaintiff again was rated as "exceeds standards" for the year of August 1, 2010, to August 1, 2011, with a performance score of 28.8. The following year, the plaintiff again was ranked as "exceeds standards," with the same performance score. The plaintiff received another reprimand, this time from Alicia Tolbert, on September 14, 2012, for referring a DHR client to an attorney and inquiring about payment arrangements for the client. The plaintiff again disputes that the actions occurred. The plaintiff's Rating Supervisor for his appraisal was Alicia Tolbert, and his Reviewing Supervisor was Cheryl Helton between 2008 and 2012. The plaintiff was rated as "exceeds standards" once again on his Employee Performance Appraisal for the year of August 1, 2012, to August 1, 2013, with a performance score of 28. His Rating Supervisor again was Alicia Tolbert, and his Reviewing Supervisor was Maria Dresser. The plaintiff was evaluated as a Social Service Caseworker for each year's appraisal.

On March 19, 2014, Robin McNeal was "demoted," at her request, from Social Service Caseworker to Financial Support Worker. (Doc. 53-14). Her salary, however, remained the same. (Id.) According to the plaintiff, three other employees in the CPS division did not perform on-call home visits: Sue Smith, a caseworker; Debby Ethereidge, a caseworker; and Robert Burrough, a service supervisor. Denard stated in her deposition that, for a time after she became director of Blount County DHR, Burrough was not on the "on-call" rotation but that he "should have been" and was added back to the rotation.

## III.   DISCUSSION

In his Third Amended Complaint, the plaintiff raised the following claims:

I.     Disability Discrimination in Violation of the Rehabilitation Act;
II.    Failure to Provide Reasonable Accommodation in Violation of the Rehabilitation Act;
III.   Retaliation in Violation of the Rehabilitation Act;
IV.    Failure to Engage in the Interactive Process in Violation of the Rehabilitation Act; and
V.     Breach of Contract.

The plaintiff has conceded to the dismissal of his state law claim for Breach of Contract, which will be dismissed by agreement. Accordingly, only claims I through IV remain to be resolved.

The defendants argue, first, that any claims based upon actions that occurred more than 180 days prior to the most recent EEOC charge or outside of the two-

year statute of limitation for the Rehabilitation Act are prohibited. Next, they argue that the plaintiff has failed to meet the requirements to be eligible for relief under the ADA or the Rehabilitation Act and that he failed to illustrate a reasonable accommodation that could have been provided to him. Defendants also argue that the plaintiff has not shown that the defendants failed to engage in the interactive process required by the ADA. Based on those arguments, defendants contend that the plaintiff's Third Amended Complaint and all claims contained therein should be dismissed with prejudice.

### A. Timeliness

The defendants first argue that some of the plaintiff's claims are untimely and therefore barred. In the Third Amended Complaint, the plaintiff's statement of facts spans events from 2008, when the plaintiff filed his first request for reasonable accommodations, to 2014, when he alleges he was forced into early retirement. The plaintiff does not, however, specify the time period or specific event(s) addressed in each Count. The plaintiff filed his first EEOC claim, claim number 420-2008-03662, on October 2, 2008. (Doc. 53-5). However, he did not file a lawsuit regarding that claim, because the Mediation Settlement Agreement with Blount County DHR resolved the charge. (Doc. 53-6). The plaintiff filed another EEOC Charge of Discrimination on February 18, 2014, claim number 420-2014-01209. (Doc. 1-1, p. 2). In his most recent charge, the plaintiff alleged

ongoing discrimination and retaliation based on his disability, with the most recent

discriminatory behavior having occurred on February 1, 2014.  (Id.)  The original

Complaint was filed in this court on March 12, 2015.  In his 2014 EEOC charge,

the plaintiff stated as follows:

> In 1996, I began my employment with the Blount County (Alabama) Department of Human Resources, a division of the Alabama Department of Human Resources (collectively, "DHR"), as a Social Service Case Worker.  I am a White male who suffers from progressive neuropathy and myopathy.  In or about 2008, I requested certain reasonable accommodations related to conducting home visits due to my physical impairments and the restrictions placed on me by my doctor (specifically, at the time, that I was not to climb stairs).  After DHR refused to allow me any accommodations and instead provided my only options as a demotion or disability retirement, I filed a Charge of Discrimination with the Equal Employment Opportunity Commission (EEOC) in or about October 2008 (EEOC Charge No. 420-2008-03662).

> Following mediation conducted by the EEOC, DHR and I entered into a Mediation Settlement Agreement ("Agreement") in June 2009 whereby DHR agreed to provide me with my documented accommodations and to transfer me to an Intake position.  A copy of the Agreement (as well as the Accommodations attached and made a part of that Agreement) is attached to this Charge.

> Although I was, in fact, transferred to an Intake position following the mediation, DHR continued to demand that I perform on-call home visits, requiring me to perform the same duties as for which DHR had expressly agreed to provide an accommodation for in the June 2009 Agreement.  Additionally, after the filing of my initial EEOC Charge and the resolution of the same, I was retaliated against by DHR, including, but not limited to, being singled out for reprimands, receiving unfavorable performance reviews, and being denied opportunities for advancement.

In July 2013, I was again forced to make a request for accommodation to DHR with documented medical proof related to my being relieved from conducting home visits. In October 2013, DHR denied my request for accommodation. One month later, on November 6, 2013, DHR provided correspondence to me stating that because "perform[ing] client home visits is an essential job function of a Social Service Caseworker" and because I was "unable to fully perform all essential job functions in [his] current Social Caseworker position . . ., [I could] no longer remain employed with [DHR] as a Social Service Caseworker." In terminating me from my position, DHR relied on the job functions of a Social Service Case Worker despite the fact that I had been employed in an Intake position since we had entered into the June 2009 Agreement.

DHR's correspondence further provided a ten (10) day mandate for me to either accept a voluntary demotion with reduced pay, be subjected to an Administrative Hearing which could result in the termination of my employment from DHR and the loss of future benefits, or for me to resign from DHR. On December 6, 2013, under protest, I was forced to accept a demotion with reduced pay. Thereafter, I was forced into disability retirement from DHR on February 1, 2014.

Based upon the aforementioned actions and/or omissions by my former employer, DHR, I believe I have been discriminated against because of my disability (related to progressive neuropathy and myopathy), including, but not limited to, the failure to make reasonable accommodations and the termination of my position, in violation of the Americans with Disabilities Act of 1990, as amended, and the Rehabilitation Act of 1973. I further believe I have been retaliated against based on my engaging in protected activity in violation of the Americans with Disabilities Act of 1990, as amended and the Rehabilitation Act of 1973.

(Doc. 1-1, pp. 2-3).

The ADA requires that a plaintiff file a timely charge with the EEOC as an administrative requirement prior to filing suit under the ADA. *See* <u>Houston v.</u>

<u>Army Fleet Servs., L.L.C.</u>, 509 F.Supp. 2d 1033, 1040 (M.D. Ala. 2007). "It is settled law that in order to obtain judicial consideration of such a claim, a plaintiff must first file an administrative charge with the EEOC within 180 days after the alleged unlawful employment practice occurred." <u>Pijnenburg v. West Georgia Health System, Inc.</u>, 255 F.3d 1304, 1305 (11th Cir. 2001). The plaintiff filed his most recent EEOC charge on February 18, 2014. Accordingly, the adverse employment action must have occurred no earlier than August 16, 2013, to be within 180 days prior to the filing of the charge. In the instant case, the plaintiff received the letter denying his request for accommodation on November 26, 2013, well within the time period. He requested the reasonable accommodation on July 11, 2013. Although this is more than 180 days prior to the filing of his EEOC claim, only the adverse employment action is required to fall within the 180-day period.

However, any of the plaintiff's claims of adverse employment actions occurring *before* August 16, 2013, are barred for failure to file a proper EEOC claim. Furthermore, the Rehabilitation Act, under which the plaintiff raises all of his remaining claims, borrows the two-year statute of limitation for personal injury claims under Alabama law. *See* <u>Everett v. Cobb County School Dist.</u>, 138 F.3d 1407, 1409 (11th Cir. 1998), Ala. Code § 6-2-38(l) ("All actions for any injury to the person or rights of another not arising from contract and not specifically

enumerated in this section must be brought within two years."). The above-styled action was filed on March 12, 2015. Therefore, any alleged violations occurring prior to March 12, 2013, are untimely, including the reprimands the plaintiff received on August 17, 2010, and September 14, 2012, which the plaintiff seems to allege were retaliatory or discriminatory in nature. The only adverse employment actions to be considered for purposes of liability and damages are the denial of the plaintiff's July 2013 request for accommodation and the plaintiff's resulting demotion and retirement. The defendants' motion for summary judgment is GRANTED insofar as no actions prior to March 12, 2013, will be considered a basis for liability under the Rehabilitation Act.

### B. Failure to Establish a Claim

The defendants also contend that the plaintiff cannot establish a disability discrimination claim or a failure to provide a reasonable accommodation claim in violation of the Rehabilitation Act. The ADA requires that an employer make "reasonable accommodations to the known physical or mental limitations of an otherwise qualified individual with a disability. . ." See 42 U.S.C. § 12112(b)(5)(A). A plaintiff may establish a *prima facie* claim for discrimination under the ADA by demonstrating "that (1) he has a disability, (2) he is a 'qualified individual,' which is to say, able to perform the essential functions of the employment position that he holds or seeks with or without reasonable

accommodation, and (3) the defendant unlawfully discriminated against him because of the disability." D'Angelo v. ConAgra Foods, Inc., 422 F.3d 1220, 1226 (11th Cir. 2005) (quoting Reed v. The Heil Co., 206 F.3d 1055, 1061 (11th Cir. 2000).

### i. Disability

Although the defendant argues in the Motion for Summary Judgment that plaintiff has not established that he has a disability under the ADA, that argument is not seriously pursued. The ADA defines a "disability," as "a physical or mental impairment that substantially limits one or more major life activities of such individual, a record of such an impairment, or being regarded as having such an impairment (as described in paragraph (3))." 42 U.S.C. § 12102(1). Major life activities include walking, standing, and performing manual tasks. 42 U.S.C. § 12102(2)(A). The plaintiff asserts that he has been diagnosed with Charcot-Marie-Tooth syndrome, which causes progressive neuropathy and myopathy, resulting in difficulty walking, climbing stairs, and overall limited mobility. The plaintiff includes medical evidence supporting his claim, including a letter from Dr. Zakir Kahn stating that the plaintiff "suffers from a chronic degenerative condition that is progressively worsening and affects his ability to walk short distances and walk on uneven surfaces." (Doc. 53-8). Accordingly, taking the

facts in the light most favorable to the non-moving party, the plaintiff has established that he is a person with a disability, as defined by the ADA.

### ii. Qualified Individual

The defendants also argue that the plaintiff cannot show that he is a "qualified individual" under the ADA. A qualified individual is defined as "an individual who, with or without reasonable accommodation, can perform the essential functions of the employment position that such individual holds or desires. For the purposes of this subchapter, consideration shall be given to the employer's judgment as to what functions of a job are essential, and if an employer has prepared a written description before advertising or interviewing applicants for the job, this description shall be considered evidence of the essential functions of the job." 42 U.S.C. § 12111(8). Defendants argue that "on-call" duties are an essential function of employment as an intake worker for Blount County DHR. Therefore, if the plaintiff cannot perform "on-call" duties with a reasonable accommodation, he is not a qualified individual under the ADA. The plaintiff's Employee Performance Appraisals include a score for completing "after hours on-call duty," and the form entitled Intake Worker Performance Standards lists performing after-hours on-call duty "as assigned" as part of the plaintiff's job description. (Doc. 45-1, pp. 48, 50-52, 56, 58, 60, 65-68).

The plaintiff cites, however, an FMLA Certification used by Blount County DHR, which lists the essential function of an Intake Worker as "[s]ee's [sic] clients in the office regarding Child/Adult abuse or neglect. Also takes phones [sic] calls regarding Child/Adult neglect or abuse. Completes homestudies as ordered by the courts." (Doc. 53-11, p. 2). The FMLA certification does not list as essential functions either on-call or field work beyond court-ordered home-studies. The plaintiff also asserts that on-call duty is a marginal function of the Intake Worker position, as on-call home visits are performed, at most, five times per year. Therefore, according to the plaintiff, the task takes up less than 1% of an Intake Worker's annual workload based on a 40-hour workweek. The plaintiff argues that, in the case of such a marginal task, the defendant's assertion alone that the task is an essential function of employment is not conclusive.

The Eleventh Circuit addressed the question of whether a duty is an "essential function" in Samson v. Federal Express Corporation, stating:

> Whether a particular job function is essential is "evaluated on a case-by-case basis by examining a number of factors." D'Angelo v. ConAgra Foods, Inc., 422 F.3d 1220, 1230 (11th Cir. 2005) (internal quotation marks and citation omitted); see also McMillan v. City of New York, 711 F.3d 120, 126 (2d Cir. 2013) ("[A] court must conduct 'a fact-specific inquiry into both the employer's description of a job and how the job is actually performed in practice.'") (citation omitted); Keith v. Cnty. of Oakland, 703 F.3d 918, 926 (6th Cir. 2013) ("Whether a job function is essential is a question of fact that is typically not suitable for resolution on a motion for summary judgment.") (citation omitted). Among the relevant factors is "[t]he

employer's judgment as to which functions are essential." 29 C.F.R. § 1630.2(n)(3)(i). Although the employer's judgment is "entitled to substantial weight in the calculus," this factor alone is not conclusive. Holly, 492 F.3d at 1285 (internal quotation marks and citation omitted). Because if it were conclusive:

> then an employer that did not wish to be *inconvenienced* by making a reasonable accommodation could, simply by asserting that the function is "essential," avoid the clear congressional mandate that employers "mak[e] reasonable accommodations to the known physical or mental limitations of an otherwise qualified individual with a disability who is an applicant or employee, unless such covered entity can demonstrate that the accommodation would impose an *undue hardship* on the operation of the business of such covered entity."

Id. (citing 42 U.S.C. § 12112(b)(5)(A)) (alteration in original).

Samson v. Federal Express Corporation, 746 F.3d 1196, 1200-1201 (11th Cir. 2014). Relevant factors in addition to the employer's judgment include: 1) written job description prepared before advertising the position or interviewing applicants; 2) how much time an employee spends performing the function; 3) consequences of the employee not being required to perform the function; 4) terms of any collective bargaining agreement that may exist; 5) work experiences of past employees in the position; and 6) the work experiences of employees currently in similar jobs." Id. at 1201.

Furthermore, the Eleventh Circuit has stated that "[d]etermining whether a particular job duty is an essential function involves a factual inquiry to be conducted on a case-by-case basis." Lucas v. W.W. Grainger, Inc., 257 F.3d 1249,

1258 (11th Cir. 2001). For purposes of summary judgment, there remains at least a substantial question of material fact as to whether on-call work and home-visits are "essential functions" of an Intake Worker, the plaintiff's position at the time of the adverse-employment action. Therefore, the question must be put to a jury for resolution.

### iii. Unlawful Discrimination

Assuming, as we must for purposes of summary judgment, that the plaintiff is a qualified individual entitled to protection by the ADA, the plaintiff contends that he was discriminated against when defendants failed to provide him with reasonable accommodations for his disability. Such accommodations are required by the ADA. 42 U.S.C. § 12112(b)(5)(A). In the instant case, the plaintiff's request for the accommodation of being taken off on-call duties was denied. He was given three options: accept a demotion with a reduction in pay, sit for an administrative hearing leading to termination, or resign. (Doc. 45-1, p. 76). The plaintiff accepted the demotion and later applied for and was granted disability retirement.

Defendants do not argue that the plaintiff did not suffer an adverse employment action. Defendants do, however, argue that it was appropriate to deny his request for accommodation, because granting the accommodation would cause an undue burden to Blount DHR and the plaintiff's coworkers. "An employer

unlawfully discriminates against a qualified individual with a disability when the employer fails to provide 'reasonable accommodations' for the disability – unless doing so would impose undue hardship on the employer." Lucas v. W.W. Grainger, Inc., 257 F.3d 1249, 1255 (11th Cir. 2001), citing 42 U.S.C. § 12112(b)(5)(A); 29 C.F.R. § 1630.9(a). The defendants argue that, due to a lack of morale and general overwork at Blount County DHR, having other employees perform on-call duty in the plaintiff's stead presented an undue hardship.

The defendants also argue that the plaintiff cannot show that he was discriminated against on the basis of his disability, as he has insufficient evidence of comparators. The plaintiff has named as comparators Sue Smith, Debby Etheridge, and Robert Burrough. (Doc. 52, p. 29). The defendants assert that the plaintiff's named comparators are not similarly situated and, therefore, cannot establish a *prima facie* case of discrimination. However, comparator evidence is not the only way to show discrimination. For example, the Eleventh Circuit has stated that a plaintiff may prevail on a gender discrimination claim without comparator evidence "if she presents sufficient evidence that would allow a jury to infer that . . . the decision-maker intentionally discriminated against her." Galdamez v. DHL Air Exp. USA, 578 Fed. Appx. 887, 892 (11th Cir. 2014). In order to do so, the plaintiff "must present 'a convincing mosaic of circumstantial evidence that would allow a jury to infer intentional discrimination by the

decisionmaker.'" Id. quoting Smith v. Lockheed-Martin Corp., 644 F.3d 1321, 1328 (11th Cir. 2011). "An inference[] is not a suspicion or a guess. It is a reasoned, logical decision to conclude that a disputed fact exists on the basis of another fact." Smith, 644 F.3d at 1328 n. 25 (quotation marks and alterations omitted).

In the instant case, the plaintiff has presented a sufficient basis to assert discrimination through his argument that the defendants' contention of "undue burden" falls short. The plaintiff argues that due to the very small number of times he actually had to take on-call duty, removing him from on-call duty would result in any given employee having to go out on-call for him only once every two years. The plaintiff argues that this cannot possibly be an "undue burden." The question of whether a burden is "undue" is factual in nature and, therefore, should be submitted to a jury.

### iv. Constructive Discharge

The plaintiff next argues that, following the denial of his request for an accommodation, he was constructively discharged from his position with Blount County DHR. In support of this allegation the plaintiff notes that, once Denard took over as director of Blount County DHR, his request for accommodation was denied, even though her predecessor, Dresser, had previously indicated that it would be approved. Furthermore, rather than offering an alternative

accommodation or a transfer without a decrease in pay, he was asked to take either a demotion, sit for an administrative hearing that likely would have resulted in his termination, or resign. The plaintiff argues that this amounts to a constructive discharge as no reasonable person could be expected to continue employment after being presented with such choices.

An employee alleging constructive discharge must show that his working conditions were so "intolerable that a reasonable person" would have felt "forced into involuntary resignation." Bourque v. Powell Elec. Mfg. Co., 617 F.2d 61, 65 (5th Cir. 1980)[5]; see also Thomas v. Dillard Dept. Stores, Inc., 116 F.3d 1432, 1433-34 (11th Cir. 1997); Mitchell v. Pope, 189 Fed. Appx. 911, 915 (11th Cir. 2006). The appellate court has denied claims based on allegations of constructive discharge where the employee assumed that she would be fired, noting that "part of an employee's obligation to be reasonable is an obligation not to assume the worst and not to jump to conclusions too fast." Foshee v. Ascension Health-IS, Inc., 384 Fed. Appx. 890, 892 (11th Cir. 2010), quoting Garner v. Wal-Mart Stores, Inc., 807 F.2d 1536, 1539 (11th Cir. 1987).

In the instant case, the plaintiff did not have to "assume the worst," or "jump to conclusions." He was informed, in writing, of his options following the denial of his request for reasonable accommodation. The plaintiff could no longer do his

---

[5]   In Bonner v. City of Prichard, 661 F.2d 1206, 1207 (11th Cir. 1981) (*en banc*), the Eleventh Circuit Court of Appeals adopted as precedent decisions of the former Fifth Circuit rendered prior to October 1, 1981.

job without accommodation, such accommodation was denied, and he was given the decision to take a demotion with a pay decrease, take the gamble of an administrative hearing, or resign. The plaintiff cobbled together for himself another option – accept the demotion and then take disability retirement. The plaintiff argues that this set of circumstances amounts to working conditions that were intolerable to a reasonable person. The defendants' Motion for Summary Judgment has failed to illustrate that there is no factual question remaining as to whether the plaintiff's working conditions were, in fact, intolerable. Therefore, this issue too is left for the jury to decide.

### C.    Failure to Engage in Interactive Process in Violation of the Rehabilitation Act

The defendants argue that the plaintiff has not set forth sufficient facts to support his claim that the defendants failed to engage in an "interactive process" with him to determine what reasonable accommodation may be feasible, as required by the Rehabilitation Act. According to the facts taken in the light most favorable to the nonmoving party, an agreement regarding his accommodation had been reached with Director Dresser. She recommended approval of his request for accommodation, and the details of the agreement were being finalized. This is supported by the emails between Dresser and the plaintiff. After Dresser was transferred and replaced by Denard, however, the decision on the plaintiff's request for accommodation suddenly changed. There was no attempt to renegotiate the

agreement. Denard simply informed the plaintiff that she was recommending his request be denied, and that he could either take a demotion, sit for an administrative hearing, or resign.

Although it is fairly clear that an interactive process took place previously, it does not seem feasible that the requirement to engage in an interactive process allows the revocation of the fruits of such a process without any attempt to revive the process. The plaintiff has acknowledged in his brief that there is no separate claim for "failure to engage in the interactive process." However, the Fifth Circuit has acknowledged that, "when an employer's unwillingness to engage in a good faith interactive process leads to a failure to reasonably accommodate an employee, the employer violates the ADA." Griffin v. United Parcel Service, Inc., 661 F.3d 216, 224 (5th Cir. 2011), citing Loulseged v. Akzo Nobel Inc., 178 F.3d 731, 736 (5th Cir. 1999).[6] The United States District Court for the Middle District of Alabama followed the principle set out in Griffin in Henderson v. Thomas, 913 F. Supp. 2d 1267, 1297 (M.D. Ala. Dec. 2012). Accordingly, though not binding, this court finds the Fifth Circuit's determination in Griffin to be instructive.

The defendants argue that it was the plaintiff who broke off the interactive process by failing to accept the transfer offered to him by Dresser. The plaintiff

---

[6] This authority can be read as holding that the failure to engage in an interactive process is subsumed in and simply part of the discriminatory conduct of failing to provide a reasonable accommodation. In the instant case, there is no serious question that the defendants denied plaintiff he accommodation he sought.

testified, however, that he saw no reason to take the transfer because he believed his request for accommodation would be approved. Additionally, the transfer would have cost the plaintiff his seventeen-years' seniority in the Department. Furthermore, the defendants contend that Denard did not fail to engage in an interactive process and argue that her actions in informing the plaintiff that she was not recommending approval of his request for accommodation was, in itself, an interactive process. Viewing the facts favorably to the plaintiff, it seems unlikely that a flat denial of a requested accommodation can amount to an "interactive process." Denard did nothing more than recommend rejection of the requested accommodation. If that can comply with the requirement for an "interactive process," no denial of a requested accommodation can ever fail to the meet the requirement. This question is fact intensive and, therefore, should be submitted to a jury for findings of fact.

### D. Retaliation

Finally, the defendants argue that the plaintiff has failed to establish a claim of retaliation. The Rehabilitation Act incorporates the anti-discrimination and anti-retaliation provisions of the Americans with Disabilities Act (the "ADA").[7] The

---

[7] See Burgos-Stefanelli v. Sec'y, U.S. Dep't of Homeland Sec., 410 F. App'x 243 (11th Cir. 2011), where the court of appeals explained:

> The Rehabilitation Act incorporates the anti-retaliation provision from § 12203(a) of the Americans with Disabilities Act ("ADA"), 29 U.S.C. §§ 791(g), 793(d), 794(d); see Sutton v. Lader, 185 F.3d 1203, 1207 n. 5 (11th Cir. 1999) (stating

ADA provides that, "[n]o person shall discriminate against any individual because such individual has opposed any act or practice made unlawful by this chapter or because such individual made a charge, testified, assisted, or participated in any manner in an investigation, proceeding, or hearing under this chapter." 42 U.S.C. § 12203(a). Retaliation claims pursuant to the ADA are evaluated under the same format as Title VII retaliation claims. To avoid summary judgment and to establish a *prima facie* case of retaliation, the plaintiff must show: 1) that the plaintiff engaged in a statutorily protected activity, 2) the plaintiff suffered an adverse employment action; and 3) the adverse action was causally related to the protected activity. Farley v. Nationwide Mut. Ins. Co., 197 F.3d 1322, 1336 (11th Cir. 1999); Burgos-Stefanelli v. Sec'y, U.S. Dep't of Homeland Sec., 410 F. App'x 243, 246 (11th Cir. 2011).

The defendants argue that the plaintiff cannot establish causation, because the time of the protected activity and the adverse employment action are too

_____

that the standard for determining liability under the Rehabilitation Act is the same as under ADA, in the context of a discrimination claim). Under the ADA's anti-retaliation provision, "[n]o person shall discriminate against an individual because such individual has opposed any act or practice made unlawful by this chapter." 42 U.S.C. § 12203(a). This anti-retaliation provision is similar to Title VII's prohibition on retaliation. See Stewart v. Happy Herman's Cheshire Bridge, Inc., 117 F.3d 1278, 1287 (11th Cir.1997). Accordingly, we assess retaliation claims pursuant to the Rehabilitation Act under the framework we use in assessing Title VII retaliation claims.

Id. at 245.

removed from one another. The defendant argues that the plaintiff's protected activity – filing an EEOC charge – occurred in 2008, but he did not have his request for accommodation denied and was not presented with his Hobson's choice of taking a demotion or resigning until 2013 and, therefore, the filing of the EEOC charge cannot be used as the basis for these adverse employment actions for the purposes of establishing a *prima facie* case of retaliation. However, the Eleventh Circuit has instructed that:

> To establish the causal connection element, "a plaintiff need only show 'that the protected activity and the adverse action were not wholly unrelated.'" <u>Clover v. Total Sys. Servs., Inc.</u>, 176 F.3d 1346, 1354 (11th Cir. 1999)(quoting <u>Simmons v. Camden County Bd. of Educ.</u>, 757 F.2d 1187, 1189 (11th Cir. 1985)). In order to show the two things were not entirely unrelated, the plaintiff must generally show that the decision maker was aware of the protected conduct at the time of the adverse employment action. <u>See</u> <u>Goldsmith v. City of Atmore</u>, 996 F.2d 1155, 1163 (11th Cir. 1993); <u>Raney v. Vinson Guard Serv., Inc.</u>, 120 F.3d 1192, 1197 (11th Cir. 1997) ("[I]n a case involving a corporate defendant the plaintiff must show that the corporate agent who took the adverse action was aware of the plaintiff's protected expression. . . ."). That requirement rests upon common sense. A decision maker cannot have been motivated to retaliate by something unknown to him. As with most facts, the defendant's awareness can be established by circumstantial evidence. <u>See</u> <u>Goldsmith</u>, 996 F.2d at 1163.
>
> The general rule is that close temporal proximity between the employee's protected conduct and the adverse employment action is sufficient circumstantial evidence to create a genuine issue of material fact of a causal connection. <u>See</u> <u>Gupta</u>, 212 F.3d at 590; <u>Bechtel Constr. Co. v. Secretary of Labor</u>, 50 F.3d 926, 934 (11th Cir. 1995) ("Proximity in time is sufficient to raise an inference of causation.") However, there is this exception: temporal proximity alone is

insufficient to create a genuine issue of fact as to causal connection where there is unrebutted evidence that the decision maker did not have knowledge that the employee engaged in protected conduct. <u>See Clover</u>, 176 F.3d at 1355-56.

<u>Brungart v. BellSouth Telecommunications, Inc.</u>, 231 F.3d 791, 799 (11th Cir. 2000).

In the instant case, the plaintiff contends that he filed his EEOC charge in 2008, he and his employers reached agreement in 2009, and he submitted another request for accommodation on July 11, 2013, when his symptoms worsened. The plaintiff initially was working with Dresser, the director of Blount County DHR. However, Dresser was transferred and Denard took her place. When Denard became the Director, Cheryl Helton, Sims' supervisor, disclosed to Denard that the plaintiff had filed an EEOC charge against Blount County DHR in 2008 and that the EEOC charge was located in a "sealed" file marked "confidential." (Denard Depo., doc. 53-18, pp. 108-109). She also pointedly told Denard that the plaintiff had received his intake position following the 2008 EEOC charge and that Helton "didn't like" that the plaintiff had filed an EEOC charge. (<u>Id.</u> at pp. 114-116). On September 21, 2013, very soon after coming to Blount County and being informed of the 2008 EEOC charge, Denard wrote a letter to Jackson at ADHR, stating that she did not recommend the approval of the plaintiff's request to be taken off of "on-call" duty. (Doc. 53-10).

The Eleventh Circuit has held that "a plaintiff satisfies [the requirement of causal connection] if he provides sufficient evidence that the decision-maker *became aware* of the protected conduct, and that there was close temporal proximity *between this awareness and the adverse employment action*." <u>Farley v. Nationwide Mut. Ins. Co.</u>, 197 F.3d 1322, 1337 (11th Cir. 1999) (emphasis added). In this case, Denard became aware of the plaintiff's EEOC complaint sometime between the plaintiff's application for accommodation on July 11, 2013, and Denard's letter on September 21, 2013 – a period of seventy-two days. The duration between Denard's discovery of the 2008 EEOC claim and her letter is near enough in time to allow a presumption of causation due to temporal proximity, particularly where Helton (the plaintiff's direct supervisor) pointed out to Denard her dislike of the fact of the filing of the charge. Accordingly, there is sufficient substantial evidence of a retaliatory animus to require a jury assessment of the claim, and the defendants' Motion for Summary Judgment is due to be DENIED as to the plaintiff's claim of retaliation.

## CONCLUSION

For the reasons set forth herein, the defendants' Motion for Summary Judgment (Doc. 47) is GRANTED IN PART with respect to all alleged acts of

discrimination or retaliation occurring *before* August 16, 2013, but DENIED as to the remainder of the plaintiff's claims. A separate order will be entered.

DONE this 16th day of October, 2017.

_____
T. MICHAEL PUTNAM
UNITED STATES MAGISTRATE JUDGE